## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **CATHLEEN MCNAMARA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )　　**Case No. 12-2466-CM** |
| | ) |
| **BETHESDA LUTHERAN COMMUNITIES,** | ) |
| **INC.,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## MEMORANDUM AND ORDER

Plaintiff Cathleen McNamara brings claims for gender and age discrimination against her former employer, Bethesda Lutheran Communities, Inc. Plaintiff alleges defendant unlawfully terminated her employment, or failed to retain her employment, following a corporate restructuring.

This matter is before the court on defendant's Motion for Summary Judgment (Doc. 46). Defendant contends that plaintiff's discrimination claims fail as a matter of law because plaintiff did not present evidence indicating defendant terminated her employment for any reason other than its stated reason—that plaintiff failed to adequately perform her job functions. The court agrees with defendant and, for the following reasons, grants defendant's motion.

### I.    Background[1]

Defendant is a Christian social service charity and nonprofit organization that provides services to persons with developmental and intellectual disabilities. Defendant hired plaintiff in 1995 and discharged plaintiff in July 2011. Shortly before plaintiff's discharge, defendant had twelve business regions, which included the South Central (Kansas) and Rocky Mountain (Colorado) Regions. From

---

[1] The following facts are properly supported and not genuinely disputed. Additional undisputed facts are included as necessary throughout this order. The court views the evidence and draws all reasonable inferences in the light most favorable to plaintiff, the nonmoving party.

2009, defendant employed plaintiff as the Business Director for its South Central Region at its campus in Overland Park, Kansas.

### A. Auditing Client Funds

As a Business Director, plaintiff was responsible for auditing client funds, determining how those funds would be audited, and training other individuals to audit client funds.[2] In March and April 2009, and again in April 2010, defendant provided training to plaintiff on how to conduct audits of client funds.

Plaintiff performed no audits of client funds in 2009. Plaintiff admits that the fact she did not perform any client audits in 2009 was a job performance failure on her part. Plaintiff also concedes that, in the calendar year 2010, she neither performed any client-fund audits, nor directed any persons to perform any audits of client funds. Plaintiff also took no steps to oversee client purchases, even though she admitted this was part of her job responsibilities.

In late 2009 and into 2010, Susan Fenderson, a Program Manager in plaintiff's South Central Region, began stealing funds from client accounts that she (Fenderson) managed. In August 2010, defendant discovered that Fenderson had stolen client funds by purchasing items on defendant's credit cards and keeping those items for herself. During the time Fenderson was stealing, Fenderson worked in plaintiff's region, and it was plaintiff's responsibility to confirm that personal items bought for individuals on defendant's credit cards were in possession of defendant's clients. Fenderson's theft of client funds totaled almost $28,000, which defendant had to repay to its clients and report to Kansas licensing regulators. In response to the theft, defendant instituted new protocols and procedures regarding auditing oversight.

---

[2] As a Business Director, plaintiff's duties also included evaluating growth opportunities for the organization, preparing and monitoring budgets, overseeing fiscal responsibilities, and performing other accounting-type functions.

Plaintiff knew that client audits were a "front-burner" issue after discovery of the theft. Specifically, plaintiff understood that she, as a Business Director, was to make sure that audits of client funds were being done on a timely and monthly basis and that updates were being put into the computer system.

By July 2011, plaintiff had failed to conduct her monthly audits. On July 26, 2011, Mike Minning, defendant's Corporate Director of Financial Reporting and Internal Control Systems, sent plaintiff an e-mail in which he stated, in part:

> It is now almost the end of July and your region is still failing to get all personal fund audit[s] completed. The personal fund audits must get done. As the Business Director in your region the personal fund audit process is your direct responsibility.
>
> Currently I can see that only the months of January, March and April have been completed but have not been updated in the master file (a process you must complete). I do not see any information for the month of February. I would like to know why nothing was recorded for February. I want everything for the months of January through June updated before you leave for vacation . . . .

Plaintiff concedes that, as of July 26, 2011, the audits were not updated and the information for February 2011 was missing. Plaintiff now contends she thought the remaining months actually were updated but simply placed in the wrong file. However, plaintiff admits that, during a telephone call with Minning that same day (July 26), she told Minning she would try get the audits finished but that she really did not have enough time and that she could not make any promises that she would get them finished.

### B. Monthly Billing

In her capacity as Business Director, plaintiff also was in charge of sending monthly bills to guardians who paid for the room and board of the clients defendant served. More specifically, plaintiff was responsible for sending bills and making sure she had an accurate census as to who was served by

defendant and at what level of reimbursement rate the client should be billed. Plaintiff admits she did not send billing statements to every guardian who should have been paying; rather, plaintiff determined to whom to send these bills on an ad hoc basis. Plaintiff's Regional Director, Deborah Rear, was critical of plaintiff's performance in the area of billing and expressed concern to plaintiff about money being lost because plaintiff did not have a system to ensure that those who were receiving services were being billed. Plaintiff concedes that her failure to send bills resulted in monetary losses to defendant of more than $25,000.

### C. The Restructure

In June 2011, defendant announced an operational restructure (to become effective September 2011) and the consolidation of its twelve business regions into six business regions, including the consolidation of its South Central and Rocky Mountain operations into a single West Central Region. This consolidation meant that, among other things, there would be one (instead of two) Business Directors for the new West Central Region. At the time defendant announced the restructure, plaintiff was aware that 1) the South Central and Rocky Mountain Regions were being consolidated into one and 2) there was a possibility that plaintiff would not have a job after the restructure.

Also in June 2011, and as a result of the upcoming restructure, defendant announced that Mark Wester would become the Regional Director of, and would be the individual selecting the Business Director for, the new West Central Region. At that time, Jeff Zielke, whom defendant hired in August 2010, was the Business Director for the Rocky Mountain Region. Zielke was twenty-four years old and a recent accounting graduate of the University of Wisconsin.[3] As Business Directors, plaintiff and Zielke had the same duties and responsibilities, but plaintiff claims she performed more duties than

---

[3] Prior to attending the University of Wisconsin, Zielke held various jobs, such as groundskeeper, maintenance worker, football official, and little league instructor.

Zielke.[4] Plaintiff concedes, however, she never observed Zielke's job performance, never supervised Zielke, never worked in the same office as Zielke, didn't know what Zielke's job duties were in Colorado, and never talked to Zielke about his job duties.

### D. Wester's Choice Between Plaintiff and Zielke

Plaintiff and Zielke were the only candidates Wester considered for the West Central Business Director position. Wester testified that, to enable him to decide between plaintiff and Zielke, he evaluated the performance and qualifications of each of them and made his decision based on that evaluation. Regarding information related to Zielke, Wester worked with Zielke on a daily basis for roughly three months and was able to observe Zielke's job performance during that time. Wester and Zielke had many interactions because they both worked in the Rocky Mountain office. With respect to information about plaintiff, Wester testified that he relied on feedback and historical information provided to him about plaintiff because Wester was relatively new to the company. In performing his evaluation, Wester claims he accessed all of the information that was available to him.

In general, Wester believed that plaintiff:

- met the minimum job qualifications;

- was a certified public accountant (and Zielke was not);

- had at least two years' management experience (and Zielke did not);

- met the minimum requirements related to communication skills; and

- had requisite knowledge of applicable local, state, and federal regulations.

However, during the time Wester was making his decision, Minning forwarded to Wester the July 26 email he (Minning) sent to plaintiff regarding her auditing failures, stating: "Mark, The attached is a significant performance issue that you should be aware of as it relates to the evaluation of

---

[4] Plaintiff had an assistant until June 2011, while Zielke did not.

candidates for the Business Director for the West Central region." Minning also forwarded the email to Jack Tobias, defendant's Vice President of Finance, and Deb Zubke, defendant's Director of Operations Integrity, describing the incident as a "failure in performance."

Wester responded, "Based on my knowledge of this ongoing issue, I would suggest we terminate Cathy [McNamara] now. I have little patience for an ongoing mishandling of client finances . . . ." Wester testified he was shocked that plaintiff didn't work to clean up the client finance audits in an environment where a consolidation was happening and positions were knowingly being eliminated. Plaintiff agrees that it is appropriate for Wester to have little patience for ongoing mishandling of client finances.

Also just prior to plaintiff's discharge, Wester participated in a conference call with Minning, Tobias, and John Twardos, Vice President of Operations, during which they discussed plaintiff's performance issues. Minning's contemporaneous notes reflect the following was discussed:

> "Has been with Bethesda for a# [number] of years (longevity); Experience; knows Kansas Billing System; Has difficulty working with RDs [Regional Directors] (Past 3 RDs); work is sometimes inaccurate/doesn't pay attention to details (budget transfer sheets $50 rounding, problems with HUD 990s, Recent problems with gift card ledgers; lacks motivation and may not be up for the challenge; recently had problems with KS billing - Region was not collecting Room and Board from individuals- $28,000 uncollected; Doesn't take responsibility or action."

(Doc. 47-7.)

### E. Plaintiff's Discrimination Claims

Plaintiff alleges gender and age discrimination related to her discharge. Until being advised of her termination on July 29, 2011, plaintiff never felt that she had been discriminated against on the basis of her age or sex. At her deposition, plaintiff testified she felt she was discriminated against because she did not get the consolidated position, even though she had more experience and had more time with the company getting to know the system, the people, and how it all worked.

Plaintiff filed a charge of discrimination with the EEOC, which investigated the matter and found that poor job performance was the reason plaintiff was not selected. Plaintiff filed the instant case, claiming sex and age discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII").

## II. Legal Standards

Summary judgment is appropriate when there are no genuine disputes as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A movant that does not have the burden of persuasion at trial has the initial summary-judgment burden of "pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). If the movant makes this showing, the burden shifts to the nonmovant to set forth facts from which a rationale trier of fact could find for the nonmovant. *Id.*

## III. Analysis

Plaintiff does not have direct evidence of discrimination, so the court analyzes her claims under the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under this framework, plaintiff has the initial burden of establishing a prima facie case of discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). If plaintiff makes this showing, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. *Id.* If defendant does so, the burden shifts back to plaintiff to show that there is a genuine issue of material fact as to whether defendant's proffered reasons are pretextual. *Id.*

### A. Plaintiff fails to establish a prima facie case

A prima facie case of discrimination generally requires a plaintiff to show 1) she is within the protected age category; 2) she was doing satisfactory work; 3) she was discharged despite the adequacy of her work; and 4) some evidence that the employer intended to discriminate against her in

reaching its reduction in force decision. *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1195 (10th Cir. 2008) (age discrimination); *Livingston v. Sodexo, Inc.*, No. 11-4162-EFM, 2013 WL 1308292, at *8 (D. Kan. Mar. 27, 2013) (gender discrimination).

Defendant does not dispute that plaintiff, a female, is within the protected age category, that she was terminated after a reduction in force had been announced, and that a younger male (Zielke) was offered the position of Business Director for the newly consolidated West Central Region. Defendant contends that plaintiff fails to establish a prima facie case of age or gender discrimination because she was not performing her job satisfactorily. The court agrees.

Plaintiff began her employment with defendant in 1995, working first as an accountant and then as an Accounting Manager. In 2009, plaintiff assumed the role of South Central Business Director, then a newly created position. Plaintiff contends that she was qualified for the newly-consolidated business director position and that she performed her job well over the years. In support, plaintiff directs the court's attention to an August 2011 letter written by Tobias (Doc. 48-7). Tobias was not involved in the decision to terminate plaintiff, and plaintiff was not in his chain of command at the time of her discharge.

Plaintiff believes this letter is favorable to her contention that she was performing her job in a satisfactory manner. (Doc. 48 at 27) ("[P]laintiff performed her job well over the years, as evidenced by Tobias' August 2011 letter."). The letter, while complimentary of plaintiff, was written at plaintiff's request and after her discharge. More importantly, Tobias expressly restricted his comments to the time period plaintiff was an Accounting Manager—from 2005 through 2009—and specifically chose to not provide comments on her job performance during the time she worked as the South Central Business Director, the relevant time period at issue in this case. (Doc. 47-8, Tobias Decl. at ¶ 13.)

Tobias's comments on plaintiff's job performance from 1995 through 2009 are not indicative of how plaintiff was performing her job in 2011. Accordingly, the court does not view Tobias's reference letter as tending to establish that plaintiff was performing her job in a satisfactory manner at the time she was discharged. In fact, that Tobias purposefully omitted any information related to plaintiff's job performance during 2010 and 2011 arguably supports defendant's position—that plaintiff was not satisfactorily performing her job in 2010 and 2011.

Indeed, the record establishes that plaintiff was not performing her job satisfactorily. The undisputed evidence is that plaintiff's Regional Director had been critical of plaintiff's performance in the area of billing and expressed concern to her about money being lost because plaintiff had no system to keep track of who was being billed; that plaintiff failed to keep track of and send monthly bills to all guardians, resulting in substantial monetary losses to defendant in excess of $25,000; that plaintiff performed no audits of client funds in 2009 or 2010, although it was her job responsibility to do so; that plaintiff's failure to oversee client-related credit card purchases was a factor in Susan Fenderson's theft of client funds totaling almost $28,000; and that plaintiff submitted a gift card ledger with at least one error. Additionally, by July 2011, at a time when plaintiff knew the auditing of client funds was important, plaintiff failed to complete her monthly audits and told her supervisor (Minning) in July 2011 that she could not make any promises that she could get the audits completed.

The court finds plaintiff has failed to establish a genuine issue of material fact that she was performing satisfactory work. While plaintiff's burden to establish a prima facie case is not onerous, *Aragon v. King Soopers, Inc.*, 19 F. App'x 806, 810 (10th Cir. 2001), it is also "not empty or perfunctory," *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1322 (10th Cir. 1997) (internal quotation omitted). Here, the only credible evidence plaintiff asserts regarding her relevant job performance is that she was qualified for the business director position and that she had worked for defendant for sixteen years.

Yet plaintiff had significant job performance failures prior to defendant's decision to restructure, and plaintiff's job performance continued to be deficient until her discharge. Plaintiff exhibited job-related performance problems over the last couple years of her employment, including just days before her discharge. Plaintiff has failed to establish a prima facie case of age or gender discrimination because plaintiff was not performing her job satisfactorily at the time her employment was terminated. *Brooks v. Holiday Healthcare, L.L.C.*, No. 06-cv-2340-KGS, 2008 WL 4499986, at *8 (D. Kan. Sept. 30, 2008) (holding that plaintiff's qualifications at hiring do not establish a genuine issue of material fact where performance problems occurred over the last fifteen months of employment).

### B. Plaintiff fails to demonstrate pretext

Even if plaintiff could meet her initial burden under *McDonnell Douglas*, defendant has come forward with legitimate, non-discriminatory reasons for discharging plaintiff—namely, plaintiff's failure to meet performance expectations. Plaintiff does not dispute defendant satisfies this burden for purposes of the instant motion. (Doc. 48 at 28.) The burden therefore shifts back to plaintiff to show pretext.

A plaintiff can show pretext by demonstrating that the defendant's stated reasons are "so weak, implausible, inconsistent or incoherent that a reasonable fact finder could conclude that it was not an honestly held belief but rather was subterfuge for discrimination." *Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (citation omitted). This court is mindful that "a mistaken belief can be a legitimate reason for an employment decision and is not necessarily pretextual." *Brooks*, 2008 WL 4499986, at *9. Consequently, in evaluating the legitimacy of an employer's proffered reason for terminating an employee, "[t]he relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs." *Rivera v. City and Cnty. of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004) (quotation omitted). As the Tenth Circuit has explained, "[t]he reason for this rule is plain: our role is to prevent

intentional discriminatory hiring practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." *Young*, 468 F.3d at 1250.

To determine whether defendant's stated reason is pretextual, the court examines the facts as they appeared to Wester, the person who made the decision to terminate plaintiff's employment. *Vigil v. City of Albuquerque*, 210 F. App'x 758, 764 (10th Cir. 2006) (citing *Kelley v. Goodyear Tire & Rubber Co.*, 220 F.3d 1174, 1177-78 (10th Cir. 2000) (stating that the court should look "at the facts as they appeared to the person making the employment decision, because it is the employer's perception that is relevant, not the [employee's] subjective evaluation of [her] own relative performance.").

As previously set forth, plaintiff was not performing key job functions satisfactorily. Wester was advised of plaintiff's deficiencies in a key job responsibility—the auditing of client funds. Wester was aware plaintiff did not properly audit client funds in 2009 or 2010 and had not completed her monthly audits as of July 2011. When asked about the missing and untimely audit reports, plaintiff reported that she would try to get them done but that she really did not have enough time and could not make any promises to finish the audits.

Wester was concerned with the client-audit issue, and plaintiff knew client audits were a top priority. In 2010, when the Fenderson client misappropriation was discovered, defendant had to report the financial improprieties to Kansas licensing regulators and repay its clients almost $28,000. On Wester's first visit to defendant's Kansas location, regulators expressed their concerns to him over the Fenderson misappropriation. Wester had good reason to be concerned about client audits. Auditing client funds was plaintiff's responsibility, it was an important responsibility, and plaintiff was failing in that responsibility.

Several days before plaintiff's discharge, Tobias forwarded his July 26 email to Wester alerting Wester of plaintiff's auditing failures. Thereafter, Wester participated in a conference call with

Minning and others, at which time other job failures were discussed. So in addition to client audits, Wester knew that plaintiff's inconsistent billing practices resulted in tens of thousands of dollars in financial losses to defendant in the prior two years, that plaintiff erred on a gift card ledger, and that plaintiff had difficulties in the past working with her supervisors. Plaintiff's job performance deficiencies were costly and substantial, and plaintiff's apparent cavalier attitude about the audit function in July 2011, even after the restructure was announced, was surprising to Wester.

Plaintiff contends that poor job performance is merely a pretext for discrimination. In support, plaintiff claims that defendant lacked objective RIF criteria; that she was more qualified because her regional economic losses were less than Zielke's; that defendant's stated reasons have been inconsistent; that Zielke's performance evaluation contains suspect language; and that she received no warnings her job performance was deficient. The court addresses each argument in turn.

Plaintiff contends that defendant lacked objective RIF criteria, calling into question defendant's non-pretextual reason for her discharge. But there is no evidence in the record that Wester used subjective criteria to make his decision, and the court sees nothing subjective in considering plaintiff's admitted performance failures, particularly in auditing and billing over which she had essential and crucial responsibilities.

Plaintiff also claims she was overwhelmingly more qualified for the position than Zielke, who was younger than plaintiff and a recent graduate of the University of Wisconsin. Plaintiff had a CPA license and more years of experience, but those qualities do not necessarily make for a better business director, especially given plaintiff's deficient work performance in accounting-related areas. In any event, the only pertinent evidence to which plaintiff points in support that she was more qualified is the fact that Zielke's Colorado region lost $1,750,000 in Zielke's first six months, as compared with plaintiff's own "[a]lleged loss of $60,000+ due to alleged auditing deficiencies." (Doc. 48 at 32.)

However, the purported economic loss in Zielke's region is not directly attributed to Zielke. Rather, the loss incurred in the Rocky Mountain Region pre-dated Zielke's hiring by two years. The evidence in the record is that defendant had quality problems with its Intermediate Care Facility ("ICF") program in Colorado the two years before Zielke was hired, which resulted in the termination of the prior Rocky Mountain Business Director and Regional Director. To that end, according to defendant's testimony, defendant poured extra resources into the Rocky Mountain Region, and that resulted in the $1,750,000 loss. Thus, the quality issues in the ICF program were already present and were not the result of Zielke's actions, and there is testimony that Zielke worked diligently to correct the issues. Conversely, there is no dispute that a $60,000 loss occurred during plaintiff's supervision and that she was responsible for the loss. The loss reported in Zielke's region, which occurred at the very beginning of his employment, does not render defendant's stated reason unworthy of belief.

Plaintiff further contends that defendant provided shifting, inconsistent reasons for her discharge. In support, plaintiff argues that defendant gave the reason "position was eliminated" in response to plaintiff's application for unemployment benefits, yet defendant told plaintiff that "performance" was the reason her employment was terminated. In these circumstances, the court does not view these stated reasons as being inconsistent. *See Juniel v. Park Forest-Chicago Heights Sch. Dist. 163*, 176 F. Supp. 2d 842, 853 (N.D. Ill. 2001) ("[S]tatement that [defendant] was honorably discharging [plaintiff] as part of a RIF is not sufficiently inconsistent with a statement that it was terminating his employment for performance problems."). Here, plaintiff's position was being eliminated via a consolidation of two positions, and plaintiff's poor job performance contributed to Wester's decision to not choose plaintiff for the consolidated position. Defendant's stated reasons are not sufficiently inconsistent to raise a genuine issue of fact.

Plaintiff next points to the job performance evaluation Wester gave to Zielke more than two months after plaintiff's discharge, wherein Wester wrote "Jeff is very open to new ideas." Without citation to any relevant authority, plaintiff claims the use of the word "new" is evidence of age discrimination. However, the court does not construe this as an age-related comment in this isolated context. Rather, it is more likely that the adjective "new" connotes the age of the ideas, not the age of the individual. Plaintiff's suggestion that this statement shows age discrimination is unpersuasive and underscores her lack of discriminatory evidence.

Finally, plaintiff contends that she continually received positive reviews and pay raises and that she received no warning her job performance was deficient. Plaintiff argues these facts cast doubt on defendant's stated reason for her discharge. *See Thompson v. Comcare, P.A.*, No. 11-4126-KHV, 2012 WL 6115093, at *5 (D. Kan. Dec. 8, 2012) (holding genuine issue of fact existed where plaintiff received positive reviews and pay raises and had received no warnings of her job deficiencies before she was discharged).

Plaintiff's account of the facts in the record related to this issue, however, is not entirely complete. Plaintiff concedes that her Regional Director had specifically talked to plaintiff about her job performance failures in the area of billing and client fund audits. Plaintiff also understood that, after the theft of client funds in 2010, her job performance in the area of client audits was a "front-burner" issue, and she understood it was her responsibility to make sure audits were completed and reports were timely submitted, which she failed to do.

Even if the court believed plaintiff was unaware that her job performance was lacking, defendant is permitted to change its evaluation of plaintiff over time. *Roberts v. Int'l Bus. Machs. Corp.*, 733 F.3d 1306, 1309 (10th Cir. 2013) (holding that changes in an employer's estimation of its employee's job performance, without more, cannot establish pretext as a matter of law). Defendant's

stated reason for discharge does not become implausible merely because defendant did not consistently express negative views about plaintiff's job performance. "After all, the quality of the employee's job performance is itself capable of change and an employer isn't prohibited from acting on honestly held beliefs about those changes." *Id.*

So even if defendant was pleased with plaintiff's job performance before her admitted failures, defendant is permitted to act honestly regarding any changes in plaintiff's job performance. Here, it is undisputed that plaintiff failed to perform essential auditing and billing functions near the end of her employment, and the court sees no compelling reason to second guess defendant's reason for her discharge on that basis. *Medlock v. United. Parcel Serv., Inc.*, 608 F.3d 1185, 1193 (10th Cir. 2010) (holding that law does not require or permit the court to second guess facially plausible business decisions of a manager); *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1169-70 (10th Cir. 2007) ("Evidence that the employer should not have made the termination decision-for example, that the employer was mistaken or used poor business judgment-is not sufficient to show that the employer's explanation is unworthy of credibility.") (citations omitted).

In the end, plaintiff might disagree with defendant's assessment of her performance, but plaintiff does not provide sufficient evidence that this reason is unworthy of belief. *See Fallis v. Kerr-McGee Corp.*, 944 F.2d 743, 747 (10th Cir. 1991) (reversing jury verdict and stating that "a plaintiff cannot prevail by merely challenging in general terms the accuracy of a performance evaluation which the employer relied on in making an employment decision without any additional evidence" of discrimination). The evidence before the court is lacking any factual basis for plaintiff's assertion that her age or gender formed the basis for her discharge. Defendant is entitled to summary judgment on this claim.

**IT IS THEREFORE ORDERED** that defendant's Motion for Summary Judgment (Doc. 46) is granted.

Dated this 18th day of April, 2014, at Kansas City, Kansas.

s/ Carlos Murguia
**CARLOS MURGUIA**
**United States District Judge**
